Davis, J.,
dissenting. This case arose out of a factional contest in relation to the selection of delegates to a national convention of the Republican party to nominate a candidate for president, and, as preliminary thereto, the selection of delegates to a state convention of the same party. •The judgment of this • court having been announced already, that struggle can not be materially affected by what we may say. I have opposed the judgment which has been rendered, not because I favored one or the other of the rival candidates, but solely for the reasons that follow, and deem them of sufficient importance to justify putting my protest on record.
I believe that the statute regulating primary *581 elections is unconstitutional in so far as it authorizes the expenditure of public money for party purposes, if it does not also infringe the constitution in other respects mentioned hereafter.' It is wholly unnecessary to go into an analysis of constitutional provisions or into a search for fundamental principles of government to sustain this contention; because, happily for this discussion, it is already well settled law that the .legislature has no constitutional power to levy taxes for any other than a public purpose, and that, as corollary thereto, it can not appropriate the public money to any private purpose. Cooley Const. Lim. (7th Ed.), 696-697, 700-701.
It seems to me entirely clear that the purpose for which it is here sought to pay public money, if justified at all under this statute, amounts more nearly to public plunder than to a public use. The public at large is in no manner directly benefited, nor is the public welfare in any way immediately affected, by the way in which any political party may settle its own factional differences. The public is no more concerned with such matters than it is with church quarrels or the rivalries in fraternal organizations. Indeed, possibly half of the voting population of the state is entirely indifferent as to which of the distinguished aspirants should be successful, and would be more than pleased if the Republican party' did not agree upon a nomination at all. Of course, when it is necessary to protect the rights of private citizens from fraud or violence, the state may interfere to that extent and no more; but I have heard no answer to the consideration which I have suggested, ex *582 cept that political parties are unavoidable and even necessary in a free government, and that therefore the state is interested in whatever would facilitate the organization and functions of a political party. I reply that there is a plain distinction between a public interest and a public use. The latter would invariably justify an expenditure of the public funds. A public interest may be so remote as not to require or deserve legislative notice. The fundamental principles of civil government require that the legislature should keep its hands off in such cases. A public interest, or to phrase it otherwise, the public welfare, may be such as to require reasonable police regulation; but that does not make the police regulation a matter of “public use” for which the public money may be expended. The statutes are full of illustrations. Two or three are sufficient. The legislature has seemed to think that the public welfare was sufficiently involved to justify it in requiring street railway companies to fit all their cars with enclosed vestibules. Does that make the construction of cars in that manner a “public use” so as to justify the state, county or municipality to pay for it? The legislature has seen fit to require railroads to put automatic couplers on their cars, to erect signs and place gates at crossings and to fence between their right of way and adjoining proprietors. Do any of these things constitute such a public use as would authorize the payment for them out of the public treasury? It seems to me that it would require a good deal of hardihood to answer in the affirmative.
So, while the conduct of a general election es *583 sentially concerns everybody and is a public use for which public money may be appropriated, a primary election which is merely preliminary to a nomination of' candidates by one political party, does not vitally concern anybody except those who may voluntarily associate themselves with such party, and is therefore not a public use. The theory that the conduct of party primary elections is “a public use” because the public is more or less interested in.what concerns the final exercise of the' right of suffrage, when carried to its logical conclusion, would justify the legislature in appropriating public money for the payment of campaign expenses of either of these candidates, if he should become the nominee of his party for president; for the public is interested in having a choice of candidates and interested in having a full discussion of their merits and qualifications and of the policies which they represent. This reasoning would be especially effective since some very virtuous statesmen seem to be of the opinion that no citizen should be permitted to pay more than a dollar for the promotion of his personal views of what the public welfare requires. If the legislative power is bounded only by such shadowy lines, the legislative discretion is unlimited, and there is no relief for the suffering taxpayer. If such be the correct interpretation of the constitution, we have substituted for the tyranny of kings that which is just as oppressive and far more insidious- — -the tyranny of legislatures. In order that I may not be misunderstood, I repeat that nobody doubts that such a primary election may be subjected to police regulation to protect the rights of individual citi *584 zens; but, as already shown, that does not constitute a public use.
It is therefore a mistake of fact, and of law also, for counsel for defendants in error to say: “There is no police regulation which does not involve and require the expenditure of public moneys to carry, it into effect”; and it is also a non sequitur when they assert that if it be conceded that the legislature has a right to enact a law, it must necessarily 'follow that it has a right to provide the means for carrying its law into effect; although, of course, criminal prosecutions for violation of laws must be at the public expense, because the enforcement of law is a public use. It has also been strongly urged in this case that when the legislature has enacted a statute against which there is no express limitation in the constitution nor one necessarily to be implied from an express limitation, it is the exercise of a legislative function, and can not be gainsaid. I know that such is the ordinary and concise way of defining the legislative power; but it is not strictly correct. The legislature is not omnipotent. It can not act arbitrarily and against the public welfare, although there be no limitation to that effect expressed in the constitution. This limitation is included in the nature of the legislative power itself, and is included in the powers which are reserved to the people. Const., Art. I, Sec. 20; Cooley Const. Lim. (7th Ed.), 242-243.
The power of the courts in such an exigency is therefore clear. “It is agreed , that the determination what is and what is not a public purpose belongs in the first instance to the legislative department. It belongs there because the taxing power *585 is a branch of the legislature, and the legislature can not lie under the necessity of requiring the opinion or the consent of another department of the government before it will be at liberty to exercise one of its acknowledged powers * * *. But it is also generally admitted that the legislative determination on this subject is not absolutely conclusive. It may be sufficiently so to put the administrative machinery of the state in' motion; but when the exaction is made of an individual, and the power of the state is made use of to compel submission, he has always the right to invoke the protection of the law. And an appeal to the law for the protection of individual property, must necessarily render the question, which lies at the foundation of the demand, a judicial question, upon which the courts can not refuse to pass judgment.” 1 Cooley oh Taxation, pp. 182-183. For the reasons stated it seems to me clear that the. auditor and treasurer should be restrained from paying any part of the expense of carrying on a primary election, which is - only remotely connected with state or county elections, and which, as we shall see hereafter, is not only .not calculated to protect the weak in their rights, but to suppress the rights of the minority.
But let us go further. In Section 2917 it is provided that the notice and application by the “controlling committee” of the county “shall skate the purpose, time, manner and conditions of the holding of such primary election, and shall prescribe the qualifications not inconsistent with the provisions of this chapter, of the persons to vote at such election.” If the conduct of such an elec *586 tion is a “public use,” for the expenses of which the public shall pay, then only the legislature can define the manner and conditions of the elections and prescribe the qualifications of the electors; the power conferred on the “controlling committee” to do so is clearly a delegation of legislative power and as such, unconstitutional. If the conduct of such an election is not a public use, if it concerns only the voluntary political association known as the Republican party, then the legislature may intervene only so far as to prevent oppression and wrong to personal rights.
But further, nobody disputes the right of the legislature, in the proper exercise of the police power, to enact a law regulating primary elections; but the exercise of that right depends on the limitation whether it would facilitate or unreasonably hinder and impede the exercise of the right of suffrage. Monroe v. Collins, 17 Ohio St., 666; Capen v. Foster, 12 Pick., 485, 492. “The legislature has undoubted power under the constitution to regulate elections, so long as it merely regulates the exercise of the elective franchise, and does not deny the franchise itself, either directly or by rendering its exercise so difficult and inconvenient as to amount to a denial.” Dewalt v. Bartley, 146 Pa. St., 529. Now in what respect does this “call” impede the free exercise of the voter’s rights?
If the call is not in conformity with the statute, the prayer of the petition should be granted for that reason. If the “call” is in pursuance of the statute, the statute and the call must stand or fall together. Except in- one particular, which I will *587 note in concluding, I will assume that the call strictly follows the statute.
The first and most obvious objection to the scheme of the committee is that it is so contrived as to prevent any possibility of the minority in the county securing any representation, however small, among the delegates, except in the improbable event of the majority scattering its votes for delegates while the minority votes solidly for one set of candidates by placing a cross in the circle. The county is made the unit of representation, except in two counties of the state, Hamilton and Cuyahoga. The election must be held at the usual voting places of the county; and although ninety-five per cent, of the voting precincts may give a majority for delegates having the same presidential preference, the other five per cent, may, by greater density of population, cast a majority of votes in the county and deprive the voters of the other ninety-five per cent, of precincts of any representation whatever. It is permitted, however, that the “controlling committees” in counties entitled to forty or more delegates, if they think that they can thereby “control” things better, “may select delegates and alternates by districts as their county executive or controlling committees may determineand thus we have one law for eighty-six counties, and another law for two counties, if the controlling committee sees fit to so legislate.
Again, this scheme subordinates all local or state interests to the expression of preference for presidential candidates. Candidates for state office have no place in it. It is assumed that every aspirant for nomination on the state ticket, from governor *588 to the end of the list, must get in line with the delegates whose banners bear the name of the presidential candidate who succeeds in carrying the county. In other words, upon the “controlling committees,” well named in the statute, of the counties and state, is conferred the power of constituting the most potent political “machine” that ever was erected in Ohio, or anywhere else, so far as I know; and no check on its despotic power is provided.
If it was deliberately planned for this purpose, it is efficient as well as daringly bold, and even impudent. If this result is an inadvertence, nevertheless the threatening opportunity is afforded, and —he who runs may read. I repeat, if this sort of procedure is not authorized by the statute, the judgment should be for the relator. If it is authorized by the statute, then the statute is unconstitutional, because it delegates to the “controlling committee” legislative power of the most far-reaching and dangerous character.
Moreover, this scheme puts upon the right to vote unfair and burdensome conditions which not only tend to hinder and impede, but even to exclude, minority voters. The statute (97 O. L., 107, Section 1) prescribes the qualifications of a voter at a primary election. I see nothing to complain of in this enactment; but by Revised Statutes, Section 2917, the controlling committee is authorized, or at least it assumes that it is authorized thereby, to further limit the qualifications of the voter as follows: “All known Republican electors and all others who will declare their belief in the principles of the Republican party and their purpose *589 to affiliate with it at the November election, complying with the act of April 20, 1904 (97 O. L., 107), shall be eligible to participate in said primary election.” .1 have already adverted to this Section 2917 as containing an unwarranted delegation of legislative power, and I have also adverted to its effect on this case if the action of the controlling committee be not authorized by the statute; but now, assuming this action to be strictly ■ within the terms oh the statute, I ask attention to the manner in which, it seems to me, it impairs and hinders the exercise of the right to vote and severely discriminates between voters. “All known Republican electors” may vote at the primary election without a confession of faith, or a declaration of party fealty at the general election. “All others,” although they may have voted with the Republican party for years, must not only make an open profession, but the voter must also declare that it is his intention “to affiliate with” the party “at the November election,” which can only mean that he pledges himself to vote for the candidates nominated without knowing who they will be'. This last requirement is a direct blow at the independence of the voter, as well as an infringement of his constitutional right .to vote without disclosing for whom he votes. The constitution declares that: “All elections shall‘be by ballot.” Const., Art. V, Section 2. That a vote by ballot imports secrecy is too well settled to be the subject of argument. Cooley on Const. Lim. (7th Ed.), pp. 910-913; McCrary on Elections, .Sec. 454. So that'a decision in New Jersey and a dictum in this, state that a secret ballot is neither a natural right *590 nor a constitutional right, can be of no significance. A plainly expressed constitutional right of the voter is violated in this condition of the call.
The cases of State, ex rel., v. Poston et al., 58 Ohio St., 620, and State, ex rel., v. Poston et al., 59 Ohio St., 122, have been cited as supporting the views of the majority in this case. Those opinions do not decide the question with which we are now dealing. In the opinion in the latter case (59 Ohio St., 136), the court itself distinguishes that case from this one, as follows: “Much that is said in the briefs of counsel and most of the cases cited relate, as does Monroe v. Collins, to enactments which impede and restrict the exercise of the right to vote.” That is precisely the proposition for which I am now contending; but the court summarily proceeded to put that question out of the case, as follows: “The provisions now under consideration, defining the conditions upon which the state will provide and thus facilitate the exercise of the right, and leaving to every elector an opportunity to vote according to his preference, are within the power of the legislature.” The court had previously-said, in the same opinion: “Nor does this provision require any elector to disclose his purpose with reference to the character of his vote, unless he voluntarily does so as a petitioner on a nomination paper. The act merely defines the conditions on which the state will cause tickets to be printed upon the ballot, leaving every elector entirely free to voté a ticket that has otherwise acquired a place on the ballot, or to supply in secrecy the names of the persons for whom he desires to vote, or become a pefitioner by giving *591 the required pledge.” I submit, therefore, that in the Poston cases this court has not advanced one step beyond the law as stated in Monroe v. Collins and the other authorities to which I have already referred; nor has it decided upon the reasonableness or effect of conditions restricting the qualifications of electors similar to or like those in the case at bar. Nevertheless, I am much inclined to think that the strength - of the argument in the Poston cases was with the dissenting judges (dissenting opinion by Minshall, J., 58 Ohio St., 633); and with the judgments in those cases and this one before me, I begin to wonder to what extent the abridgement of the right of suffrage may go before it will be pronounced unlawful.
Further, this scheme is burdensome on minorities and palpably calculated to hinder and impede, if not to exclude minority voters. Before an elector can cast his vote at the primaries he must not only pass the obstacles which we have heretofore considered, but he must secure electors, in numbers twenty times the number of delegates, to sign a petition — in Franklin county seven hundred; he must secure written consents of the delegates and alternates whom he would vote for — in Franklin county, seventy — and the consent of his choice of the candidates for noriiination for president. It is clear that upon this condition, if there were not in the county seven hundred voters of his way of thinking, he could not vote at all. And it might happen that minorities of less than seven hundred, favoring each of the several aspirants for presidential honors, not including the two distinguished citizens of Ohio, would all be excluded from vot *592 ing as they wished by the operation of this onerous condition.
As to obtaining consent of candidates, .1 need only to cite State, ex rel., v. Drexel (Neb.), 105 N. W. Rep., 174, and Dapper v. Smith, 138 Mich., 104. In the latter case it was held to be an unconstitutional restriction to require that the candidate should declare on oath that he was a candidate; and in the other case a similar judgment was rendered as to a requirement that the candidate should pay a fee, for filing nomination papers, of one per cent, of the emdluments of the office. It is easy to say that “circumstances alter cases” and that the circumstances are not the same as in this case. This is true, but in the points essential to this case they are alike. Those cases differ from this in that the conditions were more burdensome on the candidates than in this; but they both agree, as I maintain here, that the conditions were an infraction of the rights of electors, because they seriously impede the right of the elector to vote for men who are not seeking the. office.
Finally, the call is not made by the “controlling committee” of the county, as required by the statute. On its face it is made, and I quote from the call, “in accordance with the provisions — including the requirements as to time, manner, conditions and qualifications of persons who vote — of the call for said Republican State Convention duly adopted by the Republican State Central Committee on January 2, 1908, a copy of which said provisions reads as follows:” etc. One of those provisions reads as follows:' “Delegates which (?) are not selected in strict accordance with all the provisions *593 hereof - will not be entitled to sit in said convention.” It thus appears that while the statute con'fers no powers upon the state committee and does not recognize that committee, the statute has been so perverted that the state committee dictates the call and enforces it by a threat that delegates otherwise chosen shall not be seated. And yet there are some who insist that they are unable to see anything unfair or unreasonable in this proceeding. I may be obtuse and unable to appreciate the liberality and benevolence of the call, but to my mind the thing appears to be a perversion of the intention of the legislature and a monstrosity. If it is to be perpetuated and justified and sanctified in the courts, I fear that it will be the sowing of dragon’s teeth to ripen in a Terrible harvest hereafter.